The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning everyone. The first argued case this morning is No. 20-21-34, Cephalon, Inc. v. Slayback Pharma Ltd. Mr. Feldman, please proceed. Thank you, Your Honor. May it please the Court. My name is Stephen Feldman. I represent the Apotex Appellants in this case. I will be addressing issues of obviousness. My co-counsel, Nicole Stafford, who represents Appellant Milan, will address additional aspects of obviousness and also the issue of indefiniteness. The District Court legally erred in failing to find the at-issue patents invalid for obviousness by applying a flawed teaching away analysis and an overly rigid motivation standard. The District Court evidently thought that stating a preference for A over B in the prior art is a teaching away from B. However, the teaching away inquiry does not focus on whether a person of ordinary skill in the art would have merely favored one disclosed option over another disclosed option. There actually can be many alternative options, all of which are obvious. Mr. Feldman, this is Joe Toronto. Can I ask, I will assume for purposes of this question that there may be some question about the applicability of teaching away as a doctrine whose formulations have varied. Some of them have been strict. Some of them have not so much been strict. Why would we not read the District Court's findings to B that when the prior art, as to both formulation and administration, is considered together rather than in isolation, a relevant skilled artisan would not have been motivated to go down the paths of the claims path so that one did not need to rely on teaching away, though, obviously, the District Court did use that terminology. Your Honor, if I could start with the formulation patent. I think because that finding without a teach away is inconsistent with his finding about Olthoff, that Olthoff would have led a person of ordinary skill in the art to combine the PEG and the PG. He then used Drager to erase that finding, but without a teaching away, you really can't erase that finding. Olthoff is in the prior art, and what the law requires is to teach both of them together for what they fairly teach, and looking at the statute, which requires an analysis of the differences between the prior and the claimed invention, without erasing Olthoff, there really aren't differences. On the formulation side of things, you've got Price 1998, which again, basically... The administration side of things. Sorry, yes, I misspoke. The administration side, you've got Price 1998, which again, taught basically the invention, which was fast, low volume infusions of bendamustine, and those were found to be well tolerated. So again, without the teaching away of the Ribamustine monograph, and again, we can get into why we believe that those findings are not supported by the actual dated evidence of that reference, but without that teaching away, then what you're left with is the difference between the prior art and the claimed invention is basically nil. All right, please proceed. Okay, thank you. So really, I would like to get into the data of Draeger, which was the supposed teaching away reference, and the court's actual factual findings, which we don't believe support a legal conclusion, ultimately of obviousness, and even a factual conclusion of teaching away, because if you actually look at what the court relied on in Draeger to support teach away, what did it actually say, and what did the data of Draeger actually show? So if we could go to figure three of Draeger, which is APPX 22195, this is actual data of the thing that the court found Draeger said was bad, which is a PG-only formulation approximating OLTOF, and what you see is that for six months at refrigerated temperatures, which, by the way, is what Bendica is stored at and what our products are stored at, you actually have good stability, and if you actually go to the section of Draeger where the court discusses the theory of why you would use an aprotic solvent over a protic solvent, right, and what Draeger says is that you would do this so you could get stability at commercial levels, which he describes as 30 days, 90 days, 180 days, and about 365 days, and so what this shows is that with OLTOF's formulation, the PG-only formulation, you're essentially within the zone of why Draeger was doing this in the first place, which tells you that OLTOF cannot be a zero. You can't just eliminate OLTOF, and the consideration, rather, what the court should have done is treat OLTOF and Draeger together for what they fairly teach, and when you do that, and when you take the teachings of Draeger, which said, okay, well, maybe there is some deficiency in OLTOF in terms of forming PG esters, but I can improve that by reducing the OH load, well, taking that teaching and combining it with OLTOF says, okay, well, maybe there's another way to reduce the OH load, and that would be using PEG, which, again, based on the court's initial finding that you could, would be, a procedure would be motivated from OLTOF alone to do PG and PEG. Now you actually have a solution to the issue, which is to reduce the PG esterification. Mr. Feldman, this is Judge Toronto. Can I ask another question, which I'm just a little puzzled about? The district court, and as far as I can tell, the parties here seem to assume either that the formulation claims require as solvents only the protic solvents, that is, that they exclude aprotic solvents, or that at least the theory that you all presented as to what a relevant skilled artisan would be tempted and led to do would be to use only protic solvents, some combination of PEG or PG, but to omit any of the aprotic solvents, such as the Drager one, and what is your position about, and you seem to be an assumption. Can you clarify, do you think the claims actually prohibit aprotic solvents, notwithstanding the comprising language, or what? I'm not sure that this has any bearing on the bottom line here, but I was left puzzled because there's an assumption that I don't quite see supported in the claim language. So, Your Honor, as you pointed out, it's a Yes, please answer the question. Okay, so these are comprising claims. They do not exclude aprotic solvents as well. The formulation that we put on evidence of being obvious was protic only, and one of the main reasons for that is because the aprotic solvents that were approved, but the problem with DMA is that it was found to dissolve plastic. So, there weren't good aprotic alternatives, and the other aprotics that are identified, for example, in Drager, like DMSO and some of the others, have not been approved by the FDA for IV injectable solutions. So, I agree with you that these claims do not exclude aprotic solvents, but we thought, for the obviousness position, that there are actual technical and real reasons that you wouldn't necessarily want to use aprotics, which, again, teaches more towards using PEG to reduce your OH load and to reduce the esterification problem. Okay, thank you. Anything else for Mr. Feldman at this stage? We'll save you rebuttal time. Thank you, Your Honor. Okay, Ms. Stafford, you have five minutes. May it please the court, can the court hear me? Yes, sir. Going to the last question, Milan believes that the formulation claims do not exclude aprotic solvents, which is another error to find that Drager teaches away. Again, I'm not sure anything turns on it. I don't remember you saying anything at all about that in your brief. Did I miss something? No. I can't recall right now, to be honest. I believe we did say that it's not excluded, but the claims are comprising claims. But I'd like to first turn to the indefiniteness. And in our review, the term stabilizing amount of antioxidant is indefinite. This is found in pages 35 to 46 of our opening brief. In short, there are multiple potential targets for determining domestic degradation and multiple ways of measuring it. Depending on when and how degradation is determined, an antioxidant may or may not be present in a stabilizing amount in the same formulation. Even Plaintiff's expert conceded that degradation depends on storage time and temperature, but the specification provides no objective standard for either. If a POSA can choose their own way to determine degradation and there is no objective boundary- Ms. Stafford, this is Jeff Durst. Can I just ask, as I read the district court's finding, which I think actually amounts to a claim construction, the meaning of the required stabilizing amount is a stabilizing amount of an antioxidant includes any amount that decreases the amount of degradation after any time period and at any temperature. That's exceedingly broad or very broad. I know exceedingly is maybe improper, but very, very broad so that if in a comparison between the presence of the antioxidant and the absence, there is some time period and some temperature at which there is more degradation or less degradation with the antioxidant than without, then it's a stabilizing amount. I didn't see you make any argument that applying that very, very broad standard that a skilled artisan would have difficulty understanding whether something was or was not a stabilizing amount as opposed to, I don't know what temperature to look at. The answer from the claim construction is you got to look at them all. The problem is that at some temperatures, for example, refrigerated or very low temperatures, you're not going to see any loss of stability or any degradation when there's no antioxidant present. Then if you add antioxidant, you're not going to see an enhancement. Therefore, that formulation, if measured at refrigerated conditions or a very short time period, is not going to be infringing. However, if I measure it at 100 or 200 degrees or 40 degrees and at an extended time period, say 40 days or a year, then I'm going to see an enhancement with the presence of some antioxidant. Right. But why isn't that ladder all by itself sufficient to come within the definition, even if you don't see it at other temperatures or at other times? I think that's what the district court was saying. Well, I think that that's exceedingly broad and that that would not provide any real objective boundary. I could just keep something up and keep it for as long as possible. That's also inconsistent with the examples of the claims, examples of the formulation patents, which is example 335, which equate having a stabilizing amount with having an amount sufficient to have shelf life. Moreover, the patent has very many targets. So you can measure loss of initial bendamustine. You can measure bendamustine impurities. You can measure total impurities and all of those get different results, potentially at different times and temperatures. But I'd now like to move on. Have I answered your question, Your Honor? Yes. Thanks. I'd like to move on now to the method claims. For the method claims of the method patents, the only real issue is prima facie obviousness, as the court found there were no secondary considerations. The claims are directed to administration at a slightly less volume and slightly less time than was known with Trianda. However, the lower volumes and faster infusion times were disclosed in prior art, and therefore there was nothing new about that. Specifically, there were two price studies, one in 1985 that used a three-minute IV drip and one in 1998, which used a three- to 10-minute administration of bendamustine. And the unrefuted testimony is that the volume would be so low that it would overlap with the claim ranges for volume. And that was not refuted by the other side. And therefore, the law of overlapping ranges should apply, and there was a presumption of obviousness, of prima facie obviousness that the appellee would have had to rebut. However, that was not done. The district court instead looked at whether or not these were safety studies and said that they weren't. That's error. Price 1998 is a safety study. Moreover, the case law doesn't require that you have safety studies or you can prove safety as would be done for FDA approvability. Moreover, Eagle and Teva both those as safety studies and viewed them as safe. The fact that Price also did a study several years later in 2003 for different purposes using different administration is not a teaching away. Moreover, the ribamustine monograph is also not a teaching away for reasons I can go into if you'd like me to, but I believe I've already finished my initial time and therefore would like to reserve the rest of my time for rebuttal after any questions. Okay. Any other questions of the staff right at this stage? No. Okay. Let's take your rebuttal time. Let's hear from Mr. Burrell. Thank you, Your Honor. May it please the court, David Burrell for Cephalon. I'd like to start with Judge Toronto's first question of whether a teach-away is even necessary here, and the answer to that question is no, it's not. This court's decision in Arctic Cat elucidates the principle very clearly. In that case, the prior art taught the combination, the AES report taught the combination and even disclosed certain advantages of the combination with the claims steering system. But as this court said, the prior art did not stop there and proceeded to provide reasons not to have the claim combination, including the increased incidence of potential accidents. This case held explicitly that those disadvantages did not drive to the level of a teach-away. Nevertheless, the court found, affirming the decision below, that that evidence negated a finding of motivation. Mr. Burrell, this is Judge Toronto again. I think you understand that we're putting aside different facts of different cases. There's something of a doctrinal issue here. What is left of teaching-away doctrine if every kind of negative, every kind of case in which there is prior art, some positive, some negative, to use Medicam's language, point in different directions? But why wouldn't teaching-away doctrine, which does set something of a high standard, be rendered nuggatory by just reformulating it all as, well, the balance of positive and negative leaves POSA without a relevant motivation? How do we draw the line between where one analysis is appropriate and the other is appropriate? I think, Your Honor, the answer is that both inquiries are appropriate. I would agree that teaching-away requires a higher standard than simply a negative statement about a potential invention. This court has phrased it as discouragement, as dissuasion, or leading the POSA in some other path, towards some other path other than the invention. That, I agree, is a higher standard. I think it was met here repeatedly based on undisputed evidence. Right, but never mind that. I'm really trying to figure out how to think about the line between the two different ways of looking at it. Does teaching-away apply only or mostly if some prior art is very powerfully pointing toward it, and then it has to be overcome, or what? Yes, I think that if the prior art shows that a particular solution would be unsuitable or unlikely to be productive, as this court said in Medikamp or Bayer, that is met, and the prior art thereby teaches away from the invention. Where you don't have something that meets that higher standard, as you didn't in impacts, as you didn't in the Arctic Cat case, then it becomes a balancing, where the district court, on the basis of all of the prior art, looks at the advantages and disadvantages and asks the question of whether there's clear and convincing evidence of motivation to make or use the invention. I think they're two separate in the law, where it makes a difference whether one's operating under the teach-away rubric or simply the motivation rubric, and so it can make a difference there, but I think there are two different inquiries with two different standards, and I think there are cases in which the higher teach-away standard is not met, but nevertheless, motivation is absent. I think, again, Arctic Cat provides such a scenario. Did the district court in this case, and here I'm just focused on the correct me if I'm wrong, I think the district court said, if you looked at Olthoff in isolation, Hosuh would be led to find it obvious to try the PEG-PG combination here, but Drager teaches away. Is there some other place in the district court's opinion where the district court said something in substance to the effect, in any event, even if there weren't an obvious to try or whatever, that Hosuh would not ultimately be motivated to do this independent of a teaching away conclusion? Yeah, I believe so. I would read the district court's opinion, for example, at A67, where it talks about the concerns about precipitation, to provide another reason why Hosuh would not have gone down the path of using this solvent system with 90% PEG. Likewise, the district court found at A50 that there was a significant concern about the formation of PEG esters, based on unrefuted testimony from our expert, Dr. Seidman, that would provide another reason not to make or use the invention. Taken together, whether it's a teach-away or not, the prior arc suggested that there were two major problems with bendamustine. It degrades at the nitrogen mustard, and it degrades at the carboxylic acid. The district court found that the claimed solvent system would make both worse. At A50, it finds that the nitrogen mustard degradation would get worse as a result of using PEG. And at A63, it finds that the carboxylic acid degradation would get worse. So you're taking two problems. You're making both of them worse. It's not clear to me how one possibly could have been motivated to make and use this invention, given those two factual findings, which, again, were based largely on unrefuted testimony, and where it was refuted was based on credited testimony from our experts, Dr. Ancelin and Dr. Seidman. And figure three of Draeger, can you address what we heard about that? Absolutely, gladly. Draeger itself says, looking to figure three, that the PG-only formulation, which is what it made to try to reproduce Olthoff unsuccessfully, was, in its words, not feasible. Our expert testified that that data fell far below the requirements of the POSA. That's at A19085, well below the POSA standards, and the district court cited and credited that basis of Draeger. Would the POSA use protic solvents alone? Our expert testified, no, no, no. Draeger teaches using aprotic solvents. And you can use protic solvents as long as you use aprotic solvents, too. That's the testimony that was cited by the district court. That's at A19093. And Draeger says the same thing at column four lines 18 through 24. He says, you can use protic solvents, but as long as they're within the scope of the invention, as long as they're within 90% or less, then you won't get too much of these protic solvent bendamustine adducts, these degradants. So while counsel today testified that the figure three data are very good, as your honor knows, those data must be read through the lens of the person of ordinary skill in the art. And the testimony at trial credited by the district court was clear that that data, as Draeger himself says, and as our expert said, interpreting those data are unacceptable. It's infeasible. It's not good. And no, no, no, you can't do that. And that's exactly what Draeger is teaching. And that's what the district court found that it was teaching. And that is not clearly erroneous. That was plainly the correct finding by the district court. So with the court's permission, I'd like to turn to indefiniteness. Can you quickly address the administration claims and the obviousness issue on that before you? Absolutely. I was actually going to go there last because appellants went there last, but I'm happy, of course, to do it in that order. So district court's finding with respect to the administration claims, likewise, was based on undisputed evidence in some circumstances and credited expert testimony and others. While defendants focus solely on Price's administration, the court was not permitted to look at Price in isolation and was commanded by this court's jurisprudence to look at the prior art as a whole. It did so. And it found Shostky, and it interpreted Shostky, and this was fiercely disputed at trial, but it interpreted Shostky to that the longer the infusion time, the lower the toxicity. And the reverse was true, as Dr. Derendorf, our expert, said at 18-682. Shostky itself explicitly taught that infusion duration and dose fractionation appear to affect the toxicity profile. That is, the longer the infusion, the less toxicity. But it wasn't Shostky alone. The rival Mustin monograph could not be more clear that the short infusion is associated with toxicity, with phlebitis and thrombophlebitis. I'm sorry, which monograph are you talking about now? This is the rival Mustin monograph. This is the monograph, and it's at 23995 of the appendix, Your Honor. And this is the monograph that was approved by the German regulators. And what it says is that the thrombophlebitis occurs after ibuprofen injection and can be administered for three to 60 minutes. That cited a Ruffert article. Again, the interpretation of that article was disputed, but the court credited Dr. Derendorf's testimony, not their expert, Dr. Thurman. Dr. Derendorf said that 16-689, that this Ruffert article is talking about bendamustine causing the thrombophlebitis, not the other drug, vincristine. There's no other way to interpret it. So that's another clear reason not to administer in this low time. That's another clear teach-away that the district court credited. And the monograph here in the United States, the approved prior art Trianda label, likewise talks about a 30-60 administration and warns against departing downward, saying that if you have a higher CMAS, that is, if you have higher blood levels, that's associated with nausea. So after Price, the prior art uniformly taught that using bendamustine in a short administration was dangerous. Dr. Derendorf reviewed the entirety of the prior art. If your honor looks to 18-687-9-3, he reviews all of the prior art and concludes at the end that the POSA would have considered a 10-minute administration to be not safe. That is plainly within the heartland of this court's teach-away jurisprudence under the Allergan case and others. It was not safe and the POSA would not have done it. That's just the times. The volumes and concentrations provide independent basis for affirmance of the district court's judgments. Ms. Stafford suggested that there was somehow no dispute at trial that Price taught the claim volumes. Respectfully, that's not true and the district court found otherwise. He found at A-84-85 that he excluded under Rule 26 testimony from the defendant's experts who sought to testify on this topic because it was not disclosed in his expert report, and he instead gave conclusory testimony that Price's volumes were, quote, likely closer, end quote, to 50 to 100. Now, the district court, having watched all of these witnesses testify, should not find that testimony persuasive or credible and rejected it. The district court was plainly permitted to do that and plainly permitted to find that there was no clear and convincing evidence that the prior art taught the claimed volumes. Do I understand correctly that the sentence, I guess, is on A-85, far as 100 to 250 milliliter suggestion did not cover the claimed volumes, all claims require 100 milliliters or less, that the reason and the only reason, maybe, that you say that that does not actually confess an overlap at exactly 100 milliliters is that the things being measured in the first clause and the thing being measured in the parenthetical are different? They are, indeed. That's right. And at A-75, there's further evidence that the district court understood it that way. It says, Barth suggested administering bendamuctin in a solvent volume of 100. That's not a total volume of 100. That's a solvent volume of 100. If you then add the 36 milliliters of bendamuctin, you're at 136, which informs the sentence that your honor just read on A-85, that there's no overlap. I would further observe that even if Barth had taught 100, and Barth, of course, did not teach 100 total volume, that would still be double the volume required by some of the claims, which is 50 milliliters or less. Okay. Would you mind, I know you wanted to talk about indefinite before, but maybe you could do so now. Do you agree with my, I guess, characterization of what the district court said about the very, very broad meaning of stabilizing amounts? I think it is a broad meaning of stabilizing amount. I think it flows directly from the definition that's explicit in the specification. This is an unusual indefiniteness challenge. It's not as if the parties disagreed about the scope of this claim or the meaning of this claim. It's an explicitly defined claim and the lexicographical definition in the specification controls and everyone agrees. This is instead some sort of meta indefiniteness argument where the defendant suggests that there's some lack of clarity about how that definition would be applied, but per your honor's questions and per the district court's findings, there is no lack of clarity. Ms. Stafford said again, what they said at trial and what they said in their briefs, that depending on what time and temperature one uses in the HPLC measurements, one may or may not have a stabilizing amount of antioxidant. That simply is untrue. It's speculation. It's unsupported by a shred of evidence in the record. Here's what I'm a little confused about. The way that I was thinking about this, and tell me if I'm wrong, is that that may well be true, but it's immaterial because the only thing that's required for something to come into the stabilizing amount definition is that there is some time or some temperature at which the difference, antioxidant or no antioxidant, would appear. So that there may actually be lots of individual times or individual temperatures at which there is no difference, but it doesn't matter under the definition. Am I wrong in understanding the definition that way? With your permission. Yes. Well, your honor, the way I'd respond to that is that I think Nautilus does all the work in answering that question. I think the POSA would look to the specification and the usual techniques that are done with HPLC. So one wouldn't use 1,000 degrees. One wouldn't wait until time immemorial to measure it. But I think that if one is using the usual times and temperatures that the POSA would have used, guided by the specification, and one sees that with and without an antioxidant, there's a difference with respect to the amount of that there's a difference at every temperature and at every time, I think maybe I'm not communicating. I understood that within the realm of practicality, all there has to be is one time or one temperature at which there is a difference. Is that incorrect or correct under this claim construction? I think under this claim construction, if one measures at a given time and temperature and finds a stabilization, you are within the scope of the claim. I think that's right. Even if you find no difference at other times and temperatures? If one finds no difference, I think that's correct, your honor. Okay. So that leaves one thing, which was not much the focus, I think, of either the district court's opinion. A little bit more in the brief. There was a suggestion that measuring degradation is itself uncertain. Can you address that? Never mind time and temperature, just what measuring degradation? So I think there was some dispute at trial about what one would have measured. Would one have measured the impurities, the amount of impurities, or the amount of bendobustine remaining? And the district court found, and this is based on the specification that the inquiry is how much bendobustine is remaining. That's what the definition says. That's what our expert said. And that testimony was credited by the district court. So I don't think there's any lack of clarity What's the site in the district court for that, if you have it? I can find it if you don't. A95. And he's citing A19116 through 17. That's Dr. Seidman's testimony, as well as A19121. Unless the court has further questions. We have three. Any more questions for Mr. Burrell? No. Okay. Thank you, counsel. Mr. Feldman, you have two minutes. Are you unmuted? Sorry, Aaron. I was muted. Let's go back to Drager. Can you hear me? Okay. So at APPX22200, Mr. Burrell was talking about the court's finding about nitrogen mustard degradation with respect to the polyols. And Table 2 of Drager demonstrates that that just does not happen. So you had speculation from Dr. Seidman and Dr. Ancelin talking about how, well, maybe they could form theoretically, but there's no bendobustine-specific evidence of it. And in fact, that's why Drager's able to use up to 90% of a PG-PEG-ester combination in his formulation. Okay? Up to 90%. So if nitrogen mustard degradation was a problem, he would have noted it and he would have explained it. Instead, what you see in Table 2 is a comparison between DMA by itself, which is a product, and then a combination of DMA with PG, 34% PG. And if you look at HP1, which is the hydrolysis degradant, which is what happens at nitrogen mustard, you see that the number is the same. So the number for DMA by itself, with no polyol at all, degrades and creates an HP1 impurity, and then you add some polyol, and nothing different happens at the nitrogen mustard. So that is a clearly erroneous finding. It's contrary to the actual bendobustine-specific evidence. The other point I wanted to make is if you go back to Figure 3, okay, the point is that that's PG-only. None of the claims are PG-only. Sure, PG-only could be improved, okay? And Drager actually teaches you how to improve it, which is by reducing the OH load, which is what happens when you add PEG. You actually reduce the OH load. And the other critical finding that's not made, and yet the evidence shows, and Dr. Drager's preferred one is, is exactly the same. So the fact that you may have some esterification happening because of the protic solvent isn't a stop, isn't don't use it. May I continue on or just finish my thought? Yes, please finish your thought. Thank you. Okay, it's not a stop. It's not a zero. What it is is you can tolerate some control just by reducing the OH groups, and PEG does exactly that. Any more questions for Mr. Feldman? Nope. All right. Thank you. Ms. Stafford, you saved three minutes. Thank you, Your Honor. I'd like to start off with responding on the administration claims. First, the district court never made a finding that the prior art taught that administering between three and ten minutes was not safe. That's just not true. The district court did not reference in Dr. Durandorff's testimony on that. If you look at what the district court said, this is at Appendix 80 through 83, it said that it didn't consider Price because you wouldn't have relied upon it to determine a safe and effective infusion time, volume, or concentration because there wasn't enough data. There wasn't enough safety data. He false Price 85 is only testing seven patients. When he gets to Price 1998, he tested 50 patients, which is a sufficient number, and a safety study that was included in the Sal Medics Trianda brochure and also relied upon by EGLE to FDA to show that it was safe. He just said, well, they didn't disclose how the side effects were monitored, how many times side effect information was collected from patients, et cetera. None of that is required. That is applying an FDA standard to show motivation and obviousness. That is against the law. Moreover, with respect to repeated cycles, that's another reason he discounts Price. That is not required by any of the claims. At most, they require administration over two consecutive days. That is actually provided by Price 1998, which discloses giving bendamustine in three to 10-minute infusions over four days. Does it really matter whether the claims require multiple, even two, sessions if the person of skill in the art looking at the prior art and thinking, what might I change, would I be certain that what I'm trying to use this for is a multi-session regimen, even if a particular claim is to an individual session, if a POSA would not go down the path because the only thing a POSA would be finding worthwhile is an amount that would work for a multi-session regimen? I think it does matter because you're looking at the obviousness of the claims and the claims don't require and could have required repeated sessions. Moreover, the unrefuted testimony is that when you have toxicity with repeated cycles, that's due to total dose. It's not due to infusion time and volume. It's because any chemotherapeutic agent, as you continue to give it month after month, will have effects on bone marrow and have effects on blood cell counts. That's why Dr. Thurman testified that this will decrease the dose. But moving on to ribomustine, the ribomustine monograph does not say, for example, don't give shorter infusions. In fact, it says that it was well tolerated. But if you look at the actual studies that are talked about, that's the Rufert 1989 study. Can I continue? Yes, please finish your thought. Thank you. The study that it's documenting doesn't give bendamustine as a bolus, and this is at APPX 23953. In fact, bendamustine is given over one hour. The unrefuted testimony from both sides' experts is that bencrystine, which is co-administered in the study that's discussed in the ribomustine monograph, is actually what was given as a bolus. And so the discussion about there being thrombophlebitis and local irritation due to a bolus is due to the vesicant, bencrystine, not due to bendamustine. And there's nothing that says this is a teaching away. And that's what the district court relied upon for saying why you wouldn't go down that road is that it taught away. And this is exactly at Appendix 83. It's not because there was an argument that it was unsafe or there was a teaching that was unsafe, and therefore, you shouldn't go down that road. And under Galderma, the idea that maybe you have a tradeoff and you change your dosage and that may cause a tradeoff with respect to side effects is not a teaching away. Thank you very much for your time. Do you have any more questions for Ms. Stafford? No. All right. Thank you. Our thanks to all counsel. The case is taken under submission.